# EXHIBIT "A"

Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
Jordan C. Wolff (Arizona Bar #034110)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
*Attorneys for Plaintiff*



COPY

MAY 13 2019

CLERK OF THE SUPERIOR COURT
A. MCLOONE
DEPUTY CLERK

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| DAVID PICKETT, a married man,<br><br>                    Plaintiff,<br><br>          v.<br><br>CENTURY-NATIONAL INSURANCE<br>COMPANY, a licensed insurance company,<br><br>                    Defendant. | Case No.:   CV 2019-005200<br><br>**COMPLAINT**<br><br>(Eligible for Commercial Court) |

Plaintiff David Pickett, by and through his attorneys, Mills + Woods Law, PLLC, for his Complaint against Defendant Century-National Insurance Company alleges as follows:

### PARTIES, VENUE, AND JURISDICTION

1.      This is an action to recover damages for breach of contract and breach of the duty of good faith and fair dealing.

2.      At all relevant times, Plaintiff David Pickett ("Pickett") was a resident of Maricopa County, Arizona.

3.      Defendant Century-National Insurance Company ("CNIC") is an insurance company licensed to do business in the state of Arizona.

4.      Plaintiff's claims arise out of a policy issued by Defendant and covering Plaintiff's real property located in Maricopa County, Arizona.

5.      The damages in question exceed the limits of all inferior courts.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

6.    This Court has personal and subject matter jurisdiction over all parties and claims herein.

7.    Maricopa County is the proper venue for this action because the events that give rise to this action occurred in Maricopa County.

## GENERAL FACTUAL ALLEGATIONS

8.    On October 18, 2015, Picket resided at 4007 West Rue De Lamour Avenue, Phoenix, Arizona 85029 (the "Residence").

9.    The Residence is a single-family home of approximately 1,952 square feet.

10.    At all relevant times, Pickett owned the Residence.

11.    On February 20, 2013, CNIC began insuring the Residence.

12.    From February 20, 2015, until February 20, 2016, there was an effective homeowner insurance policy (the "Policy") covering the Residence and its contents.

13.    Pursuant to the terms of the Policy, CNIC agreed to compensate Pickett for loss or damage to the Residence.

14.    Pickett timely paid all premiums due under the Policy and otherwise performed all conditions precedent to coverage of the Residence and its contents.

15.    On October 18, 2015, the Policy was in effect.

16.    On or about October 18, 2015, there was a hailstorm in Phoenix, Arizona, which caused damage to the Residence (the "Hailstorm").

17.    The Hailstorm caused extensive damage to the roof of the Residence and the air conditioning units mounted on the roof of the Residence.

18.    Pickett subsequently learned about the damage caused by the hailstorm in or around the middle of January 2016.

19.    On or around January 20, 2016, Pickett submitted a homeowner insurance claim to CNIC for repairs to the roof and air conditioning units of the Residence.

20.    After becoming aware of the damage to the Residence, on or around mid-January 2016, Pickett notified CNIC of the damage and loss the Hailstorm caused and requested that CNIC cover the damage pursuant to the terms of the Policy.

21.     Around the same time, Pickett hired a public adjuster, Select Adjusters, LLC ("Select Adjusters") to assist with his insurance claim regarding hail damage to the Residence.

22.     On or around January 26, 2016, CNIC performed an inspection of the Residence and claimed it would need additional time to complete its investigation.

23.     CNIC's early investigation purported that the Residence was in the path of an earlier hailstorm, around October 5, 2010.

24.     CNIC claimed that part or all of the damage to the Residence was a result of the October 5, 2010, hailstorm, not the October 18, 2015, hailstorm.

25.     On January 26, 2016, CNIC requested from Pickett copies of documentation about the purchase of the Residence in 2011, and the home inspection that would have taken place around that time.

26.     CNIC also requested information about the previous insurers of the Residence.

27.     On February 23, 2016, CNIC advised Pickett that it needed additional time to complete its investigation.

28.     On March 22, 2016, CNIC advised Pickett that it had retained Attorney Kerry Griggs ("Griggs") of the Cavanagh Law Firm to assist in their investigation.

29.     On March 31, 2016, in an attempt to further delay, Griggs notified Pickett that CNIC would like to obtain a statement from Pickett by Examination Under Oath ("EUO").

30.     From April 2016 until August 2016, CNIC advised Pickett that it required additional time to complete its investigation because it was waiting on Pickett's EUO.

31.     On September 8, 2016, Pickett engaged in the EUO with the presence and advice of undersigned counsel.

32.     Following the EUO, CNIC and Griggs requested additional documentation concerning Pickett's purchase of the Residence, previous insurers on the Residence, home inspection reports of the Residence around the time of purchase, and any other pertinent records to their investigation of the claim for damage caused by the October 18, 2015 hailstorm.

33.     Pickett engaged in good faith searches, requests, and inquiries for information in response to CNIC's demands.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

3

34.     Pickett provided evidence of homeowner insurance that was effective on August 19, 2011 through August 19, 2012, and September 30, 2012 through December 22, 2012, with no claims having been submitted during that period.

35.     Pickett also provided an invoice for air conditioning service dated September 28, 2015, which did not indicate that there was any damage to the roof and/or roof-mounted air conditioning unit and handler.

36.     On March 17, 2017, CNIC, through Griggs, sent Pickett a position statement with respect to Pickett's claim.

37.     The position statement letter "accommodated" Pickett with an additional thirty (30) days to provide transaction documentation from when Pickett purchased the Residence in or around September 2011, including but not limited to a home inspection report, title documents, and prior homeowner insurance policies covering the Residence.

38.     CNIC indicated that without such documentation, it would be forced to deny Pickett's claim and close its file on the matter.

39.     On May 17, 2017, CNIC, through Griggs, denied Pickett's claim in its entirety.

40.     To date, repairs to the Residence have not been performed.

## COUNT I      BREACH OF CONTRACT

41.     Plaintiff restates and re-alleges the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

42.     Defendant issued a policy of insurance, which was a contract that ensured that Plaintiff would be compensated for partial or total loss of the Residence.

43.     Plaintiff paid all premiums due under the Policy, submitted all proofs of loss required under the Policy, and performed all other conditions required of him under the Policy.

44.     Defendant failed to provide benefits as provided in the Policy despite its contractual obligation to do so.

45.     Defendant's substantial delay to pay the Policy benefits acted to destroy the very security of the Policy Plaintiff purchased.

46.     Defendant breached the Policy by refusing and failing to pay Plaintiff's claim.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

47.     As a direct and proximate result of Defendant's breach of contract, Plaintiff has sustained damages in an amount to be proven at trial.

### COUNT II      BREACH OF FIDUCIARY DUTY

48.     Plaintiff restates and re-alleges the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

49.     Plaintiff was at all relevant times an insured under a policy of insurance issued by Defendant.

50.     This relationship gives rise to fiduciary duties owed by Defendant to Plaintiff.

51.     Defendant, as Plaintiff's insurer and fiduciary, was required to act with the highest degree of honesty, loyalty, diligence, good faith, and fair dealing.

52.     As a fiduciary, Defendant was required to make a full and truthful disclosure to Plaintiff of all material facts.

53.     Defendant breached its fiduciary duties to Plaintiff by the conduct alleged herein.

54.     As a direct and proximate result, Plaintiff sustained damages in an amount to be proven at trial.

### COUNT III      BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

55.     Plaintiff restates and re-alleges the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

56.     Implied in the Policy issued by Defendant is the covenant of good faith and fair dealing pursuant to which Defendant was bound to act in good faith, and, in the exercise of fair dealing, act fairly and honestly toward Plaintiff, and do nothing to impair, interfere with, hinder, or injure Plaintiff or Plaintiff's ability to receive benefits under the Policy.

57.     Defendant repeatedly breached the covenant of good faith and fair dealing by its conduct as described herein.

58.     As a direct and proximate result of Defendant's breach of the covenant of good faith and fair dealing, Plaintiff has sustained damages in an amount to be proven at trial.

## COUNT IV   <u>BAD FAITH</u>

59.   Plaintiff restates and re-alleges the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

60.   Defendant issued a policy of insurance, which was a contract that ensured that Plaintiff would be compensated for partial or total loss of the Residence.

61.   Defendant has acted in bad faith in failing to provide benefits as provided for in the Policy.

62.   Defendant has acted in bad faith in failing to compensate Plaintiff for the damages caused by the October 18, 2015, hailstorm.

63.   Defendant has acted in bad faith and breached its implied covenant of good faith and fair dealing and breached its independent promise to adjust the claim consistent with the Arizona Unfair Claim Practices Act, A.R.S. §§ 20-461 and 462, in the following ways without limitation:

a. Failing to acknowledge and act reasonably and promptly upon communication with respect to claims arising under an insurance policy;

b. Failing to conduct a prompt and adequate investigation of claims arising under an insurance policy;

c. Refusing to pay claims without conducting a reasonable investigation;

d. Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

e. Compelling the insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately owed;

f. Failing to promptly provide a reasonable explanation of the basis in the insurance policy relative to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

g. Attempting to settle a claim for less than the amount to which a reasonable person would have believed he was entitled; and

h. Delaying the investigation or payment of claims.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

64.     Violation of the Arizona Unfair Claim Practices Act is a breach of the implied covenant of good faith and fair dealing of the Policy, which resulted in reasonably foreseeable consequential damages.

65.     Defendant acted in bad faith and breached the implied covenant of good faith and fair dealing and breached its independent promise to adjust the claim consistent with the Arizona Department of Insurance Regulations, namely A.A.C. R20-6-801 by, without limitation, failing to:

    a.  Complete investigation of a claim within 30 days after notification of claim, when its investigation can reasonably be completed within such tie;

    b.  Failing to advise within fifteen working days after receipt by the insurer of properly executed proof of loss, of the acceptance or denial of the claim by the insurer;

    c.  Failing to keep Plaintiff apprised of his claim;

    d.  Failing to, if the insurer needs more time to determine whether a first party claim should be accepted or denied, notify Plaintiff within fifteen working days after the receipt of the proof of loss giving the reasons more time is needed; and

    e.  Failing to inform Plaintiff in a letter setting forth the reasons additional time is needed for investigation 45 days from the date of the initial notification and every 45 days thereafter.

66.     As a direct and proximate result, Plaintiff has sustained damages in an amount to be proven at trial.

67.     This matter arises out of contract. Therefore, Plaintiff is entitled to recover his costs and attorneys' fees under A.R.S. § 12-341.01

68.     Plaintiff is entitled to prejudgment interest at the highest legal rate on the benefits to which he is entitled under A.R.S. § 20-462.

## COUNT V     UNFAIR SETTLEMENT PRACTICES

69.     Plaintiff restates and re-alleges the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

70.     Defendant is engaged in the business of insurance in the State of Arizona, and the Policy was issued and delivered to Plaintiff in the State of Arizona.

71.     Defendant committed the acts described herein knowingly and as part of a general business practice of:

    a.  Failing to acknowledge and act reasonably and promptly upon communications with respect to claims arising under an insurance policy;

    b.  Failing to conduct the prompt and adequate investigation of claims arising under an insurance policy;

    c.  Refusing to pay claims without conducting a reasonable investigation;

    d.  Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

    e.  Compelling the insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately owed;

    f.  Failing to promptly provide a reasonable explanation of the basis in the insurance policy relative to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

    g.  Attempting to settle a claim for less than the amount to which a reasonable person would have believed he was entitled; and

    h.  Delaying the investigation or payment of claims.

72.     The actions of Defendant were without just or reasonable cause and were knowingly committed with the intent to gain for Defendant an unfair advantage over the Plaintiff, and to deprive Plaintiff of his rightful benefits under said insurance policy. These actions were done willfully, fraudulently, maliciously, oppressively and in a conscious disregard of Plaintiff's rights with the intent to defraud, constituting an evil mind, as a proximate consequence of which Plaintiff is entitled to exemplary or punitive damages in an amount sufficient to punish and deter future conduct of a similar sort.

73.     These acts constitute violations of A.R.S. §§ 20-461 and 462.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

74. As a direct and proximate result, Plaintiff sustained damages in an amount to be proven at trial.

## COUNT VI     NEGLIGENCE

75. Plaintiff restates and re-alleges the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

76. Defendant owed Plaintiff the duty to act as a reasonably careful person and to exercise reasonable care and skill in the performance of its duties as insurer and insurance adjuster.

77. Defendant breached these duties by the conduct alleged herein.

78. As a direct and proximate result, Plaintiff sustained damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands that judgment be entered in his favor and against Defendant as follows:

A. For judgment on all Counts for Plaintiff;

B. For compensatory, general, and specific damages against Defendant in an amount to be proven at trial;

C. For pre-judgment and post-judgment interest to the extent permitted by law;

D. For reasonable attorneys' fees and costs pursuant to A.R.S. § 12-341 and 341.01;

E. For punitive damages in an amount sufficient to punish Defendant and to deter such conduct in the future; and

F. For such other and further relief as is just, proper, and/or equitable under the facts and circumstances of this case.

**RESPECTFULLY SUBMITTED** this 13th day of May 2019.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLS + WOODS LAW, PLLC

By____/s/ Jordan C. Wolff_____
        Robert T. Mills
        Sean A. Woods
        Jordan C. Wolff
        5055 N 12th Street, Suite 101
        Phoenix, AZ 85014
        Attorneys for Plaintiff

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1

**ORIGINAL** Filed on this 13th day
of May 2019, with the Clerk of
2   the Maricopa County Superior Court

3

4

/s/ Elisabeth A. Small
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

11

# EXHIBIT "B"

# THE CAVANAGH LAW FIRM
### A Professional Association

March 17, 2017

**KERRY M. GRIGGS**
602 322 4017
kgriggs@cavanaghlaw.com

File No. 41153-0042

**VIA U.S. MAIL and
E-MAIL**

Sean Woods
Mills + Woods Law PLLC
5055 N. 12th St., Suite 101
Phoenix, Arizona 85014
swoods@millsandwoods.com

|     | Re: | Insured: | **PICKETT, DAVID** |
|-----|-----|----------|--------------------|
|     |     | Date of Loss: | **10/18/2015** |
|     |     | Claim No.: | **6861545 (H0803823)** |
|     |     | Policy No.: | **HAZ035691 0** |

Dear Sean:

What follows is the present coverage position of Century-National Insurance Company ("CNIC") with respect to this claim.

As you are aware, this claim stems from Mr. Pickett's assertion that, on October 18, 2015, a hailstorm damaged the roof of his residence at 4007 W. Rue de Lamour Avenue, Phoenix, Arizona 85029. He claims to have been unaware of any alleged damage until early January of 2016, when he was solicited by a public adjuster. He thereafter submitted a claim to CNIC.

CNIC's early investigation revealed that the home was likely in the path of an earlier hailstorm, around October 5, 2010. Mr. Pickett purchased the home about a year after this earlier storm. He didn't apply for insurance coverage with CNIC until February of 2013. Before that, the home was apparently insured by a different carrier.

Given these facts, CNIC determined that there was a significant chance that all or part of

8242848_1

Sean Woods
March 17, 2017
Page 2

the alleged damage to the roof occurred before the inception of the CNIC policy. CNIC was confident that documentation would be available to explore this issue, considering that the purchase of the home fell between the two hailstorms.

Of course, typical home purchases generally involve property inspections, disclosure statements, appraisals, insurance verifications, photographs, and other activities that specifically address insurance and conditions at the property. Unfortunately, neither Mr. Pickett nor his public adjusters were able to provide copies of these documents directly to CNIC.

CNIC, therefore, hired this law firm to help coordinate the investigation and to conduct Mr. Pickett's examination under oath. On March 31, 2016, we sent a letter to Mr. Pickett, asking him to sign authorizations for documents from his real estate agent and designated broker. We also asked that he provide the following:

1.  All documents that identify the insurance company that provided homeowners insurance on the 4007 W. Rue de Lamour Avenue residence immediately before you obtained the insurance coverage with CNIC;

2.  All documents that identify all other insurance companies, if any, that provided homeowners insurance on the 4007 W. Rue de Lamour Avenue residence between the time you purchased the residence and the time you obtained the insurance coverage with CNIC;

3.  All settlement statements, escrow instructions, offers, acceptances, real estate contracts, memoranda, photographs, amendments, loan applications, title insurance, property disclosure statements, property inspection reports, closing statements and other such documents related to your purchase of the 4007 W. Rue de Lamour Avenue residence;

4.  All written communications between you and Adreina Caballero concerning your purchase of the 4007 W. Rue de Lamour Avenue residence, including without limitation letters, facsimiles, e-mails, text messages and other such communications;

5.  All repair records, invoices, bids, estimates, proposals, contractor agreements and other such records relating to repairs, upgrades and/or remodeling at the 4007 W. Rue de Lamour Avenue residence from the date of your first offer purchase the residence through

8242848_1

October 18, 2015;

6.     All photographs of the 4007 W. Rue de Lamour Avenue residence
       between the date of your first offer to purchase the residence and the
       date of closing; and

7.     All other information you wish to have CNIC consider in connection
       with your insurance claim.

Mr. Pickett executed the authorizations, but otherwise provided very little additional
substantive information in response to these requests. Significantly, he provided none of
the documents that are generally found in a buyer's packet at closing of a home purchase
transaction through a title company.

Similarly, we received no documents directly from the real estate agent and designated
broker. This is true even though Mr. Pickett's real estate agent, Adreina Caballero, was
his colleague and associate around that time. Indeed, at the time of the request, Mr.
Pickett was also a licensed real estate agent. He was apparently practicing out of the
same offices as Ms. Caballero. Before that, they worked together at a jewelry store.

During his examination under oath on September 8, 2016, Mr. Pickett testified that he
had spoken to Ms. Caballero about the authorization she received from our office.
Although she apparently gave no indication that she did not intend to comply with our
request, we have received no documents or other communications from her up to the
present time.

Mr. Pickett also testified that he received a closing package from the title company when
he purchased the residence. However, he was unable to locate it. He said that a home
inspection had been done, but did not have a copy of the inspection report. He agreed
that the best options for obtaining a copy of the inspection report would be the files of
Ms. Caballero and the title company. As to insurance issues, Mr. Pickett testified that
Liberty Mutual insured the residence before CNIC. However, he said that he had no
documentation in his possession to confirm this.

With respect to mortgage loan documents, Mr. Pickett indicated that he might have
copies in his possession. However, he has not provided them to CNIC or this office.

After the examination under oath, we followed up with your office to encourage Mr.
Pickett to secure the records from Ms. Caballero. We reminded him that this request fell
within his cooperation obligations under the insurance policy. We also requested that he
execute an authorization allowing us to seek the records directly from the title company.

8242848_1

Sean Woods
March 17, 2017
Page 4

Surprisingly, the title company refused to honor the scope of the authorization as drafted. The title company only provided a copy of the closing settlement statement, commitment for title insurance and a few supporting records.  When pressed, the title company initially suggested that Mr. Pickett put limits on what records could be released to us. Later, after efforts to obtain records by your office, the title company informed us that it would release no further documents without a court order.

Given the foregoing, we would remind Mr. Pickett of the following provisions from his CNIC insurance policy:

## HOMEOWNERS 3
## SPECIAL FORM

### [HO 00 03 04 91]

**AGREEMENT**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

**DEFINITIONS**

In this policy, "you" and "your" refer to the "named insured" shown in the declarations and the spouse if a resident of the same household.  "We," "us" and "our" refer the Company providing this insurance.  In addition, certain words and phrases are defined as follows:

\* \* \*

6.   "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

\* \* \*

**SECTION I – PROPERTY COVERAGES**

**COVERAGE A - Dwelling**

We cover:

1.   The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling …

8242848_1

\* \* \*

## SECTION I – PERILS INSURED AGAINST

## COVERAGE A – DWELLING and COVERAGE B – OTHER STRUCTURES

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property.  We do not insure, however, for loss:

\* \* \*

2.     Caused by:

\* \* \*

    e.     Any of the following:

        (1)     Wear and tear, marring, deterioration;

        (2)     Inherent vice, latent defect, mechanical breakdown;

\* \* \*

        (6)     Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings;

\* \* \*

3.     Excluded under Section I – Exclusions

Under items **1.** And **2.**, any ensuing los to property described in Coverages A and B not excluded or excepted in this policy is covered.

\* \* \*

## SECTION I - EXCLUSIONS

\* \* \*

1.    We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

                    \* \* \*

    e.    **Neglect,** meaning neglect of the "insured" to use all reasonable means to save and preserve property at and after the time of a loss.

                    \* \* \*

2.    We do not insure for loss to property described in Coverages A and B caused by any of the following.  However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

    a.    **Weather conditions.**  However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph **1.** Above to produce the loss;

    b.    **Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body;

    c.    **Failure, inadequate or defective:**

                    \* \* \*

       (2)    Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

       (3)    Materials used in repair, construction, renovation or remodeling; or

       (4)    Maintenance;

8242848_1

Sean Woods
March 17, 2017
Page 7

of part or all of any property whether or off the
"residence premises."

## SECTION I – CONDITIONS

\* \* \*

2.   **Your Duties After Loss.**  In case of a loss to covered
property, you must see that the following are done:

  a.   Give prompt notice to us or our agent;

  \* \* \*

  d.   Protect the property from further damage ...

  \* \* \*

  f.   As often as we reasonably require:

  (1)   Show the damaged property;

  (2)   Provide us with records and documents we
  request and permit us to make copies; and

  (3)   Submit to examination under oath, while not in
  the presence of any other "insured," and sign
  the same;

  \* \* \*

8.   **Suit Against Us.**  No action can be brought unless the policy
provisions have been complied with and the action is started
within one year after the date of loss.

  \* \* \*

## SECTIONS I AND II – CONDITIONS

\* \* \*

2.   **Concealment or Fraud.**  [See SPECIAL PROVISIONS
ENDORSEMENT – ARIZONA, CNI HO 01 02 02 14,

8242848_1

Sean Woods
March 17, 2017
Page 8

below]

\* \* \*

4.      **Waiver or Change of Policy Provisions.**

A waiver or change of a provision of this policy must be in writing by us to be valid.  Our request for an appraisal or examination will not waive any of our rights.

\* \* \*

**SPECIAL PROVISIONS ENDORSEMENT – ARIZONA**

**[CNI HO 01 02 02 14]**

\* \* \*

**SECTION I AND II – CONDITIONS**

\* \* \*

2.      **Concealment or Fraud.**  We do not provide coverage for an "insured" who, whether before or after a loss, has:

a.      Intentionally concealed or misrepresented any material fact or circumstance;

b.      Made false statements of facts which, if known to us, would have caused us not to issue the policy; or

c.      Engaged in fraudulent conduct relating to this insurance.

\* \* \*

CNIC is persuaded that, with appropriate diligence and follow up, Mr. Pickett should be able to obtain copies of the key transaction documents surrounding his purchase of the 4007 W. Rue de Lamour Avenue residence in September of 2011.  This is especially true considering the nature of his business relationship with Adreina Caballero, including the fact that they were fellow real estate agents working out of the same office for a time.

8242848_1

Sean Woods
March 17, 2017
Page 9

We can't imagine why Ms. Cabellero would unilaterally decide to ignore the authorization. We have similar difficulty understanding why the title company would insist on a court order to release records that were originally provided to Mr. Pickett in the first place. It certainly seems unreasonable to require CNIC to initiate litigation just to obtain copies of such records. To the extent that additional efforts are required for these purposes, it is CNIC's determination that such efforts are the responsibility of Mr. Pickett, not CNIC. The same holds true for purposes of documents concerning prior insurance coverage on the residence.

Accordingly, at the present time, CNIC is of the opinion that the failure of Mr. Pickett to secure copies of the transaction and insurance documents surrounding his purchase and ownership of the 4007 W. Rue de Lamour Avenue residence constitutes the failure of conditions of insurance coverage under the CNIC policy. At the same time, as an accommodation to Mr. Pickett, CNIC will agree to provide an additional 30 days for Mr. Pickett to satisfy these conditions. If, within this time frame, Mr. Pickett is able to provide the requested documentation or illustrate that the documents' release is imminent, CNIC will keep its file open and will continue its investigation under reservation of rights. Otherwise, CNIC will have no choice but to deny the claim and close its file.

We look forward to Mr. Pickett's anticipated cooperation.

Best Regards,

Kerry M. Griggs
For the Firm

KMG

cc:    Robert Killian (*via e-mail only*)

8242848_1

# EXHIBIT "C"

# CAVANAGH

May 17, 2017

**KERRY M. GRIGGS**
602 322 4017
kgriggs@cavanaghlaw.com

File No. 41153-0042

<u>VIA U.S. MAIL and</u>
<u>E-MAIL</u>

Sean Woods
Mills + Woods Law PLLC
5055 N. 12th St., Suite 101
Phoenix, Arizona 85014
swoods@millsandwoods.com

|       |              |                        |
|-------|--------------|------------------------|
| Re:   | **Insured:**     | **PICKETT, DAVID**         |
|       | **Date of Loss:**    | **10/18/2015**             |
|       | **Claim No.:**       | **6861545 (H0803823)**     |
|       | **Policy No.:**      | **HAZ035691 0**            |

Dear Sean:

This will provide the final coverage position of Century-National Insurance Company ("CNIC") with respect to this claim.

As you are aware, this claim stems from Mr. Pickett's assertion that, on October 18, 2015, a hailstorm damaged the roof of his residence at 4007 W. Rue de Lamour Avenue, Phoenix, Arizona 85029. He claims to have been unaware of any alleged damage until early January of 2016, when he was solicited by a public adjuster. He thereafter submitted a claim to CNIC.

CNIC's early investigation revealed that the home was likely in the path of an earlier hailstorm, around October 5, 2010. Mr. Pickett purchased the home about a year after this earlier storm. He didn't apply for insurance coverage with CNIC until February of 2013. Before that, the home was apparently insured by a different carrier.

Given these facts, CNIC determined that there was a significant chance that all or part of

8300030_1

Sean Woods
May 17, 2017
Page 2

the alleged damage to the roof occurred before the inception of the CNIC policy.  CNIC was confident that documentation would be available to explore this issue, considering that the purchase of the home fell between the two hailstorms.

Of course, typical home purchases generally involve property inspections, disclosure statements, appraisals, insurance verifications, photographs, and other activities that specifically address insurance and conditions at the property.  Unfortunately, neither Mr. Pickett nor his public adjusters were able to provide copies of these documents directly to CNIC.

CNIC, therefore, hired this law firm to help coordinate the investigation and to conduct Mr. Pickett's examination under oath.  On March 31, 2016, we sent a letter to Mr. Pickett, asking him to sign authorizations for documents from his real estate agent and designated broker.  We also asked that he provide the following:

1.   All documents that identify the insurance company that provided homeowners insurance on the 4007 W. Rue de Lamour Avenue residence immediately before you obtained the insurance coverage with CNIC;

2.   All documents that identify all other insurance companies, if any, that provided homeowners insurance on the 4007 W. Rue de Lamour Avenue residence between the time you purchased the residence and the time you obtained the insurance coverage with CNIC;

3.   All settlement statements, escrow instructions, offers, acceptances, real estate contracts, memoranda, photographs, amendments, loan applications, title insurance, property disclosure statements, property inspection reports, closing statements and other such documents related to your purchase of the 4007 W. Rue de Lamour Avenue residence;

4.   All written communications between you and Adreina Caballero concerning your purchase of the 4007 W. Rue de Lamour Avenue residence, including without limitation letters, facsimiles, e-mails, text messages and other such communications;

5.   All repair records, invoices, bids, estimates, proposals, contractor agreements and other such records relating to repairs, upgrades and/or remodeling at the 4007 W. Rue de Lamour Avenue residence from the date of your first offer purchase the residence through

Sean Woods
May 17, 2017
Page 3

October 18, 2015;

6.    All photographs of the 4007 W. Rue de Lamour Avenue residence between the date of your first offer to purchase the residence and the date of closing; and

7.    All other information you wish to have CNIC consider in connection with your insurance claim.

Mr. Pickett executed the authorizations, but otherwise provided very little additional substantive information in response to these requests. Significantly, he provided none of the documents that are generally found in a buyer's packet at closing of a home purchase transaction through a title company.

Similarly, we received no documents directly from the real estate agent and designated broker. This is true even though Mr. Pickett's real estate agent, Adreina Caballero, was his colleague and associate around that time. Indeed, at the time of the request, Mr. Pickett was also a licensed real estate agent. He was apparently practicing out of the same offices as Ms. Caballero. Before that, they worked together at a jewelry store.

During his examination under oath on September 8, 2016, Mr. Pickett testified that he had spoken to Ms. Caballero about the authorization she received from our office. Although she apparently gave no indication that she did not intend to comply with our request, we have received no documents or other communications from her up to the present time.

Mr. Pickett also testified that he received a closing package from the title company when he purchased the residence. However, he was unable to locate it. He said that a home inspection had been done, but did not have a copy of the inspection report. He agreed that the best options for obtaining a copy of the inspection report would be the files of Ms. Caballero and the title company. As to insurance issues, Mr. Pickett testified that Liberty Mutual insured the residence before CNIC. However, he said that he had no documentation in his possession to confirm this.

With respect to mortgage loan documents, Mr. Pickett indicated that he might have copies in his possession. However, he has not provided them to CNIC or this office.

After the examination under oath, we followed up with your office to encourage Mr. Pickett to secure the records from Ms. Cabellero. We reminded him that this request fell within his cooperation obligations under the insurance policy. We also requested that he execute an authorization allowing us to seek the records directly from the title company.

8300030_1

Surprisingly, the title company refused to honor the scope of the authorization as drafted. The title company only provided a copy of the closing settlement statement, commitment for title insurance and a few supporting records.  When pressed, the title company initially suggested that Mr. Pickett put limits on what records could be released to us. Later, after efforts to obtain records by your office, the title company informed us that it would release no further documents without a court order.

On March 17, 2017, we sent a letter outlining why it was Mr. Pickett's duty to obtain copies of the key transaction documents surrounding his purchase of the residence.  This was especially true considering the nature of his business relationship with Adreina Caballero, including the fact that they were fellow real estate agents working out of the same office for a time.  We further informed you that Mr. Pickett's failure to secure these documents, despite repeated requests and accommodations, constituted the failure of conditions of insurance coverage under the CNIC policy. CNIC offered an additional 30 days for Mr. Pickett to satisfy these conditions before it denied the claim and closed its file.  To date, there has been no response to our March 17, 2017 letter and Mr. Pickett still has not provided the requested copies of the transaction and insurance documents surrounding his purchase and ownership of the subject residence.

Given the foregoing, we would again remind Mr. Pickett of the following provisions from his CNIC insurance policy:

## HOMEOWNERS 3
## SPECIAL FORM

### [HO 00 03 04 91]

### AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

### DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown in the declarations and the spouse if a resident of the same household.  "We," "us" and "our" refer the Company providing this insurance.  In addition, certain words and phrases are defined as follows:

* * *

8300030_1

6.      "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

* * *

## SECTION I – PROPERTY COVERAGES

## COVERAGE A - Dwelling

We cover:

1.      The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling …

* * *

## SECTION I – PERILS INSURED AGAINST

## COVERAGE A – DWELLING and COVERAGE B – OTHER STRUCTURES

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property.  We do not insure, however, for loss:

* * *

2.      Caused by:

* * *

e.      Any of the following:

(1)      Wear and tear, marring, deterioration;

(2)      Inherent vice, latent defect, mechanical breakdown;

* * *

(6)      Settling, shrinking, bulging or expansion, including resultant cracking, of pavements,

8300030_1

patios, foundations, walls, floors, roofs or
ceilings;

\* \* \*

3.    Excluded under Section I – Exclusions

Under items **1.** And **2.**, any ensuing los to property described in
Coverages A and B not excluded or excepted in this policy is
covered.

\* \* \*

## SECTION I - EXCLUSIONS

\* \* \*

1.    We do not insure for loss caused directly or indirectly by any
of the following. Such loss is excluded regardless of any other
cause or event contributing concurrently or in any sequence to
the loss.

\* \* \*

e.    **Neglect,** meaning neglect of the "insured" to use all
reasonable means to save and preserve property at and
after the time of a loss.

\* \* \*

2.    We do not insure for loss to property described in Coverages
A and B caused by any of the following.  However, any
ensuing loss to property described in Coverages A and B not
excluded or excepted in this policy is covered.

a.    **Weather conditions**.  However, this exclusion only
applies if weather conditions contribute in any way
with a cause or event excluded in paragraph **1.** Above
to produce the loss;

b.    **Acts or decisions**, including the failure to act or
decide, of any person, group, organization or

governmental body;

c.     **Failure, inadequate or defective:**

* * *

(2)     Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3)     Materials used in repair, construction, renovation or remodeling; or

(4)     Maintenance;

of part or all of any property whether or off the "residence premises."

## SECTION I – CONDITIONS

* * *

2.     **Your Duties After Loss.**  In case of a loss to covered property, you must see that the following are done:

a.     Give prompt notice to us or our agent;

* * *

d.     Protect the property from further damage …

* * *

f.     As often as we reasonably require:

(1)     Show the damaged property;

(2)     Provide us with records and documents we request and permit us to make copies; and

(3)     Submit to examination under oath, while not in the presence of any other "insured," and sign the same;

8300030_1

\* \* \*

8.   **Suit Against Us.**  No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

\* \* \*

## SECTIONS I AND II – CONDITIONS

\* \* \*

2.   **Concealment or Fraud.**  [See SPECIAL PROVISIONS ENDORSEMENT – ARIZONA, CNI HO 01 02 02 14, below]

\* \* \*

4.   **Waiver or Change of Policy Provisions.**

A waiver or change of a provision of this policy must be in writing by us to be valid.  Our request for an appraisal or examination will not waive any of our rights.

\* \* \*

## SPECIAL PROVISIONS ENDORSEMENT – ARIZONA

[CNI HO 01 02 02 14]

\* \* \*

## SECTION I AND II – CONDITIONS

\* \* \*

2.   **Concealment or Fraud.**  We do not provide coverage for an "insured" who, whether before or after a loss, has:

a.   Intentionally concealed or misrepresented any material fact or circumstance;

b.   Made false statements of facts which, if known to us,

8300030_1

Sean Woods
May 17, 2017
Page 9

would have caused us not to issue the policy; or

c.     Engaged in fraudulent conduct relating to this
       insurance.

* * *

Given the foregoing, CNIC has no choice but to conclude that Mr. Pickett has failed to cooperate with CNIC in connection with this insurance claim. This failure to satisfy conditions of coverage constitutes a breach of Mr. Pickett's contractual obligations under the insurance policy. This relieves CNIC of any coverage obligations concerning Mr. Pickett's alleged loss.

Accordingly, at this time, CNIC **denies Mr. Pickett's insurance claim in its entirety**. We regret this result, but it is mandated by the contract and the circumstances of this matter. In connection with denial, CNIC continues to reserve all rights, as previously outlined, waiving none.

Under the circumstances, we would again highlight the following from Mr. Pickett's insurance policy:

8.     **Suit Against Us.** No action can be brought unless the policy
       provisions have been complied with and the action is started
       within one year after the date of loss.

If Mr. Pickett feels as though the denial of his claim is unjustified, he is free to address this matter with the Arizona Department of Insurance Consumer Affairs Division (www.azinsurance.gov/consumerassistance.html or 602-364-2499).

Respectfully,

Kerry M. Griggs
For the Firm

KMG

cc:     Robert Killian (*via e-mail only*)

8300030_1